# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:13-00051-3 |
| | ) | Judge Sharp |
| JOSHUA THOMAS SLIZOSKI | ) | |

## MEMORANDUM

Pending before the Court is Defendant Joshua Slizoski's "Motion to Dismiss the Indictment Due to Government Interference With a Defense Witness." (Docket No. 187). On April 13, 2015, the Court held an evidentiary hearing on the Motion, at the conclusion of which, the parties were directed to file post-hearing briefs addressing specific issues. Those briefs having been received, and the Court having fully considered the matter, Defendant's motion will be denied.

### I. Factual Background and Findings

On March 14, 2013, a federal grand jury returned a three-count Indictment against Defendant and others. In Count One, Defendant is charged with conspiring to manufacture, possessing with intent to distribute, and distributing anabolic steroids. In Count Two, he is charged with aiding and abetting in the distribution or possession with intent to distribute Human Growth Hormone ("HGH"). In Count Three, Defendant is charged with aiding and abetting the fraudulent importation of HGH and misbranded drugs.

Defendant's position is that he removed himself from the drug distribution venture more than five years before the return of the Indictment and, as such, the statute of limitations bars his prosecution. More specifically, he claims that he withdrew from the alleged conspiracy at some point prior to March 8, 2008, and so informed Defendant Kenneth Ward, for whom Defendant

1

worked repackaging steroids. He also claims that his withdrawal could be confirmed through the testimony of Jed Sharkey, an unindicted co-conspirator, who also worked for Ward and was Defendant's roommate during the relevant time period.

As support for his position on the statute of limitation defense, Defendant points to documents that he received during discovery, including several emails. The names of the authors and recipients in the emails are coded, but Defendant identifies "MrX Encrypted" as Brian Wainstein, the alleged ringleader of the steroid organization (charged in a separate Indictment in this Court); "J B" as Jeanin Disterhoft, a co-Defendant in this case who acted as the accountant for the organization; and "Jon Juan" as Ward, another indicted co-conspirator.

In a March 23, 2008 email, Wainstein asked Disterhoft for a listing of all "staff," where they worked, and what they were paid. Disterhoft responded that afternoon by providing a list of 44 "employees" that included Sharkey, but not Defendant. Defendant argues his name was not on the list supplied by Disterhoft because he had already left the conspiracy, a point which is further supported by a series of emails exchanged by Weinstein and Ward between March 18 and 20, 2008.

In the first email, Wainstein instructed Ward to close and no longer use the United Parcel Service ("UPS") store post office box that Defendant had previously opened in Gulfport, Mississippi.[1] Ward agreed to do so, and asked about having one of his "guys from Mississippi" (presumably Sharkey) set up a new box in Murfreesboro, Tennessee. By email dated March 20, 2008, Wainstein accepted the proposal and a new UPS box was opened in Murfreesboro that same day.

---

[1] Contrary to Defendant's statement in his post-hearing brief, Wainstein did not simply instruct Ward "to close the mailbox that had been maintained by Mr. Slizoski." (Docket No. 224 at 4). Rather, the email stated: "We had a seizure to this address[.] Do not ship anything here and close this address and provide and [sic] alternate address for this please." (Def. Ex.6).

2

In addition to the foregoing, Defendant also relies on an email he sent (utilizing Sharkey's address) to Agent Alex Davis of the Food and Drug Administration on April 4, 2008. In that email he summarized his relationship with Ward and Sharkey, and then wrote:

> in the first week of march ken said there was a package coming to my box a day later. I received a text from ken saying nevermind. then within the next couple dasy later he siad they weren't sinding anything else to my box, I didn't ask questions. I was glad to be *done* with him.

(Def. Ex. 6, emphasis added, scrivener's errors in original). This email, Defendant argues, shows that he had left the conspiracy by the first week of March 2008.

Obviously, the emails about staffing and the changing of the mailboxes are just circumstantial evidence which may or may not tend to establish that Defendant left the conspiracy when he claims, and Defendant's email to Agent Davis is self-serving. Defendant insists, however, that testimony from Sharkey would shore up the evidence and establish that Defendant did, in fact, leave the conspiracy at some point more than five years before the return of the present Indictment.

Defendant contends that the Government, through the interactions of Agent Davis and Assistant United States Attorney ("AUSA") Brent Hannafan, effectively coerced Sharkey to change his story, thereby unlawfully interfering with Defendant's ability to present his statute of limitations defense. To place this argument in context, a bit more background is necessary.

According to investigative reports, on March 18, 2008, customs agents intercepted a package from China that contained vials of HGH. The package was addressed to "Heavens Touch Body Essentials" at the post office box that Defendant had opened in Gulfport.

On April 2, 2008, Agent Davis spoke with Defendant at his residence. Defendant stated that he and Sharkey had been paid by Ward to package steroids and prescriptions drugs at an apartment

3

in Metairie, Louisiana. He also stated that, at Ward's direction, he had opened the Gulfport post office box, and was paid to receive and then re-ship packages of steroids that were shipped to the post office box. At some point during the discussion, Sharkey arrived at the residence, corroborated much of what Defendant had said, and stated that he, too, had opened a post office box at Ward's request.

Two days after the encounter, Defendant sent the already mentioned email about being "done" with Ward to Agent Davis. The investigation continued thereafter, with Sharkey apparently cooperating with the Government in its case against Ward, who, in turn, gave a statement identifying other co-conspirators, as well as information about Wainstein and his organization.

On August 12, 2010, Wainstein and Siobhan Hatton, another alleged co-conspirator, were indicted in this Court. Those defendants were charged with the same offenses alleged in the Indictment in this case, as well as money laundering offenses. Approximately one month later, the Wainstein Indictment was unsealed and arrest warrants were issued so that the Government could seek extradition of Wainstein and Hatton to the United States. Approximately one year later, and while still awaiting the extradition of those Defendants, Agent Davis contacted the Defendants in this action and Sharkey and advised them to consult with counsel since federal charges against them were likely to be filed.

As noted, the Indictment in this case was filed on March 14, 2013. At least part of the reason for the delay was the Government's acquiescence to counsel's request that Defendant not be charged until he returned from Kuwait where he was serving with the Mississippi Army National Guard.

On January 15, 2014, Defendant filed a Motion to Dismiss. Among other grounds, Defendant asserted that the Indictment was untimely because he had withdrawn from the conspiracy

4

at some point before March 8, 2008. An accompanying Memorandum explained that

> Mr. Sharkey . . . is expected to testify at an evidentiary hearing that near the end of February 2008, but no later than March 8, 2008, Mr. Slizoski affirmatively and unequivocally withdrew from any and all contact with Ken Ward and any activities associated with any alleged co-conspirator or the alleged conspiracy. It is anticipated that Mr. Sharkey will testify at the evidentiary hearing that Mr. Slizoski communicated his decision directly to Mr. Ward as well as Mr. Sharkey. The evidence at the evidentiary hearing will also reveal that Mr. Slizoski did not know nor had he ever spoken to any of the alleged co-conspirators other than Mr. Ward.

(Docket No. 103 at 6).

After the Motion to Dismiss was filed, Sharkey was telephonically interviewed by AUSA Hannafan and Agent Davis. Eric Herbert, Sharkey's counsel at the time, was present in AUSA Hannafan's office during the interview. The interview occurred on April 30, 2014, and lasted approximately 27 minutes.

During the interview, Sharkey recalled that sometime in the February to March 2008 time frame, Ward and Defendant argued back and forth via text messages, but he did not know whether the argument related to construction work or drug packaging. He further stated, however, that he did not recall ever hearing Defendant state that he was "out" or "done" working for Ward.

Also during the interview, AUSA Hannafan asked Sharkey if he had spoken to Defendant recently. Sharkey stated that the two had exchanged text messages and later provided copies of those messages to Agent Davis. Those messages were exchanged on April 29, 2014, and read as follows:

> Sharkey to Defendant: "Your lawyer is misinterpreting what I said to her. I do not know when or what was said when you got in that fight with ken ward I have no clue. Honestly I don't. And I will testify to that It makes me pretty upset that my words are getting turned around into something that I didn't say. This is why I am and will not talk to her Sorry man. But I'm not going to lie"

> Sharkey to Defendant: "My lawyer needs to be contacted first and I need to hear

5

from him before anything is ever brought up or said about this case ever again"

Defendant to Sharkey: "I'm not tracking but I understand. I guess I'm in the dark on what has been said"

(Def. Ex. 12 at 1-2, scrivener's errors in original).

After an evidentiary hearing was set and a continuance granted, Defendant voluntarily withdrew the Motion to Dismiss. (Docket No. 138). He did so on August 6, 2014.

On January 29, 2015, Roger Clemons, a private investigator for Defendant, spoke to Sharkey by telephone. Unbeknownst to Sharkey, the conversation was recorded.

During the conversation, Sharkey stated that Defendant and Ward were always arguing "before he [Defendant] got out," and was not sure what is was about, but that Ward was "jacking [Defendant] around." Sharkey also said that Defendant finally got fed up and "basically told him to take a leap," and that, to the best of his knowledge, that occurred "at least two to three weeks before the 'DEA' even showed up at the house." Later in the conversation he reiterated that Ward was told "to take a leap" weeks before agents showed up at their residence. Sharkey also said that Defendant had sent Ward a text message which basically told Ward he was tired of the "sh**," Ward could go "f*** himself," and Defendant did not want to talk to him. Sharkey said he would sign an affidavit that set forth his recollection of those events.

After receiving a proposed affidavit, Sharkey sent an email to Defendant's counsel dated February 3, 2015, which indicated that he removed a reference in the affidavit as to when he went to Tennessee because he was "not completely sure [about] that part." (Def. Ex. 5 at 1).[2] Sharkey

---

[2] During his conversation with Clemons, Sharkey could not recall exactly when he went to Murfreesboro to help Ward, but he believed it was after Defendant and Ward had their falling out, and he was certain that Defendant did not travel to Tennessee. According to Agent Davis's report, Sharkey stated during his initial interview that "[f]rom about 3/06/2008 to about 3/20/2008, Ward paid Sharkey to package anabolic steroids and other prescription drugs at his stash house located in Antioch, Tennessee." (Def. Ex. 3 at 4).

6

was then sent an email containing the revised affidavit which, in relevant part, stated:

> I recall to the best of my knowledge that at least two or three weeks before federal agents came to our house to question us about the packages, Josh Slizoski had decided to stop working for Ken Ward because of ongoing disputes over the previous months. I saw the text message Josh Slizoski sent to Ken Ward indicating that he wanted no further contribution [sic] with Ken Ward and his business.

(Id. at 2).

On February 10, 2015, Clemons emailed Sharkey, asking him if he had signed and mailed the affidavit. Two weeks later, Sharkey responded:

> Roger I am going to have to retract my statement that I made to you when we talked I can't be 100% sure that it's the truth I'm not even sure its 50/50 So at this point I'm worthless Cause I can't remember And I have been racking my brain about this for a while and I just dint know what happened anymore I sorry For all the trouble I really do apologize

(Def. Ex. 2, scrivener's errors in original).[3]

In between the time that Sharkey talked with Clemons and the time he wrote stating that he was retracting his statement, Sharkey spoke telephonically with Agent Davis and AUSA Hannafan.[4] That conversation occurred on February 13, 2015, and lasted approximately 23 minutes.

During the interview, Sharkey was first informed that he was under no obligation to talk to the Government. Sharkey stated that he understood and was speaking voluntarily.

AUSA Hannafan asked if Sharkey had recently spoken to a private investigator. Sharkey conceded that he had, first stating that he told the investigator he did not recall seeing a text message from Defendant to Ward that indicated that he was quitting, but then stating that he advised the investigator that Defendant and Ward had been fighting and that Defendant sent Ward a text telling

---

[3] Although the email heading indicates that it was sent on February 24, 2015, Clemons testified that he received in on the 23rd and it was forwarded to Defendant's counsel on that date.

[4] At this time, Sharkey remained unindicted and was no longer represented by Attorney Herbert.

7

him that he was quitting and would no longer be working for Ward.

AUSA Hannafan then asked Sharkey if he recalled their telephone conversation of April 30, 2014. While Sharkey recalled that they did speak by phone, he allegedly could not recall the specifics. AUSA Hannafan told Sharkey that he had stated he did not remember Defendant telling Ward he was "out" or "done," and also reminded him about the text messages he had exchanged with Defendant, including the one that said Defendant's lawyer was misrepresenting what Sharkey had said. After the text messages were read to him, Sharkey stated that he must have "misspoken" when he talked to the investigator, and that what he had said in the April 30, 2014 telephone conversation was accurate. He then said that his memory about the details was "fuzzy" and asked that the text messages be sent to him so he could refresh his recollection.

Sharkey also told AUSA Hannafan that he had not signed, and was not going to sign, the affidavit. When asked to explain what affidavit he was referring to, Sharkey stated that he had received an affidavit from Defendant's counsel that set forth what he had told Clemons. Sharkey stated that he did not think that what he had told Clemons was accurate, and that he would not sign an affidavit that was untruthful.

AUSA Hannafan advised Sharkey that whether or not he signed the affidavit was entirely up to him. He also informed Sharkey that if he had lied to Agent Davis during the April 30, 2014 interview, he could face federal charges, or that if he lied on the witness stand at trial he could be prosecuted for perjury. AUSA Hannafan told Sharkey that he was not being threatened with federal charges, but that Agent Hannafan wanted Sharkey to fully understand the potential ramifications of not being truthful. Sharkey agreed to speak with AUSA Hannafan and Agent Davis after Sharkey had reviewed the three text messages that were to be forwarded to him by Agent Davis.

8

On February 23, 2015, Sharkey, AUSA Hannafan, and Agent Davis spoke again by telephone. During this conversation, Sharkey said that, after reviewing the text messages, he recalled them, but also recalled that Defendant had stopped working for Ward before agents first visited their residence. Sharkey was told that this recollection was entirely different than the one he had provided during the April 2014 interviews and was asked if something had occurred to change his memory of the events. Sharkey first said that he had reviewed "case documents" he had been provided by Attorney Herbert, and remembered that Defendant had stopped working for Ward because Defendant never went to Tennessee to work for Ward. Sharkey next stated, however, that he did not know why his story had changed, that he was at a "loss for words," and that "he not going to lie for anyone." (Def. Ex. 13 at 1). Sharkey also stated that he remembered talking to Defendant's lawyer prior to April 30, 2014, and telling her that Defendant had stopped working for Ward. He also claimed not to remember telling Agent Davis, AUSA Hannafan, and Attorney Herbert during the April 30, 2014 interview that he did not recall Defendant ever telling Ward that he was "out" or "done."

As for the three text messages, Sharkey claimed to remember sending one of them because Defendant's lawyer had allegedly "twisted his words around" to give them a different meaning, but reiterated that he was not going to lie. During the conversation, Sharkey also stated that he was "scared" he was going to get in trouble because he said one thing a year ago and something different now. Sharkey stated that he was going to contact Defendant's attorney and tell her that he could not testify at trial because he was not 100% certain that Defendant had stopped working for Ward before agents arrived at their residence. Sharkey placed his certainty level at 60%. The interview was concluded with AUSA Hannafan telling Sharkey that whatever he decided to do was his own

9

decision, but that he should make sure that he was truthful.

Most of the foregoing was covered in detail during the evidentiary hearing on Defendant's Motion to Dismiss. However, a few further points are necessary, including some specific factual findings based on this Court's assessment of the credibility of the witnesses.

First, Sharkey invoked his Fifth Amendment rights repeatedly during the hearing. Accordingly the Court has no basis to judge his credibility and can draw no inferences about how he viewed his interactions with Agent Davis and AUSA Hannafan.

Second, the Court found Agent Davis to be a credible witness. In this regard, the Court specifically credits his testimony that AUSA Hannafan did not threaten Sharkey with prosecution for making a false statement to a federal agent, or with prosecution for perjury. Rather, AUSA Hannafan only warned him of the potential ramifications for not telling the truth, and did so only one time.

Third, the Court found Attorney Herbert to be credible. Specifically, the Court credits his testimony that, during the April 20, 2014 telephone conference, Sharkey did not have any clear understanding of Defendant leaving the conspiracy before the agents came to the residence, and that Sharkey was upset that Defendant's counsel misquoted what he had said in Defendant's original request for dismissal on statute of limitations grounds.

Fourth, the Court also finds that Attorney Herbert was not acting as a "*de facto* agent of the Government," as Defendant claims. In this regard, even though it seems relatively clear that the three text messages that were exchanged between Sharkey and Defendant arose after Attorney Herbert called Sharkey and told him what was alleged in Defendant's first Motion to Dismiss, the Court finds that Attorney Herbert did not direct Sharkey or suggest to Sharkey that he send the text

messages to Defendant.

## II. Application of Law

The Motion to Dismiss is premised on the argument that the Government's interactions with Sharkey violated Defendant's constitutional rights. More specifically he argues that the Government substantially interfered with his Fifth and Sixth Amendment rights.

"A federal court's authority to dismiss an indictment stems from its supervisory powers." United States v. Matsa, 540 Fed. App'x 520, 524 (6th Cir. 2013). Among many others, this authority exists where a defendant shows a substantial interference with his Sixth Amendment "right to present witnesses," or his Fifth Amendment right to be free "from improper governmental interference with his defense." United States v. Girod, 646 F.3d 304, 311 (5th Cir. 2011). "When alleged misconduct occurs prior to trial, the question of whether to dismiss the indictment is left to the district court's discretion." Matsa, 540 Fed. App'x at 524 n.3.

"A defendant's right to present his own witnesses to establish a defense constitutes a fundamental element of due process and is protected by the Compulsory Process Clause of the Sixth Amendment." United States v. Emuegbunam, 268 F.3d 377, 400 (6th Cir. 2001) (citing Wash. v. Tex., 388 U.S. 14, 19 (1967)). "Various prosecutorial and judicial actions aimed at discouraging defense witnesses from testifying deprive a defendant of this right." Id. (collecting cases).

"[T]he Government violates a defendant's due process right to a fair trial if it acts with the deliberate intention of distorting the factfinding process, such as by interfering with a defense witness through threats and intimidation." United States v. Quinn, 728 F.3d 243, 258 (3rd Cir. 2013). However, "a prosecutor does not engage in misconduct merely by interviewing a potential defense witness, United States v. Polanco, 510 Fed. App'x 10, 12 (2nd Cir. 2013) (citing United States v.

11

Simmons, 670 F.2d 365, 371 (D.C. Cir. 1982)), or by "merely warning a witness of the consequences of perjury," United States v. Pierce, 62 F.3d 818, 832 (6th Cir. 1995) (citing United States v. Smith, 997 F.2d 674, 679–80 (10th Cir. 1993)). Rather, "governmental conduct must amount to a substantial interference with a witness's free and unhampered determination to testify before [a court] will find a violation of due process or the Sixth Amendment." Emuegbunam, 268 F.3d at 400.

To prevail on his substantial interference claim, Defendant is required to "'demonstrate misconduct by a preponderance of the evidence.'" United States v. Juan, 704 F.3d 1137, 1142 (9th Cir. 2013) (citation omitted). "Even when such interference occurs, a violation of a defendant's right to call witnesses in his defense is subject to harmless error analysis," Emuegbunam, 268 F.3d at 400, and, thus, "there can be no constitutional violation unless the defendant can also make some plausible showing that the witness's testimony would have been both material and favorable to the defendant[. ]" United States v. Linder, 2013 WL 812382, at *8 (N.D. Ill. Mar. 5, 2013).

Here, when the evidence adduced at the hearing and this Court's findings are considered in light of the applicable law, it is clear that Defendant has not come close to establishing substantial interference so as to warrant dismissal of the Indictment. Three reasons compel that conclusion, even assuming for the sake of argument that Sharkey's testimony would not otherwise be inadmissible hearsay.

First, the evidence does not establish any impropriety by the Government, or more particularly, by AUSA Hannafan. What it does show is that AUSA Hannafan, on but one occasion, warned Sharkey of the potential consequences of either having lied to a federal agent or lying under oath in the future.

AUSA Hannafan did not tell Sharkey that charges would be brought, and he did not otherwise threaten him. Rather, Sharkey was told that whether to sign the affidavit or to testify were his decisions to make, but he should be sure that whatever he did was in keeping with the truth. The warning was only given after Sharkey had given conflicting statements at a time when Sharkey was no longer represented by counsel, and the Sixth Circuit, on more than one occasion, has stated that "'the government has an obligation to warn unrepresented witnesses [about the] risk'" of perjury charges being filed. United States v. Stuart, 507 F.3d 391, 398 (6th Cir. 2007) (quoting Pierce, 62 F.3d at 832).

Second, the record lacks any evidence that Sharkey felt threatened or intimidated.[5] To the Court's knowledge, Sharkey has never made any such claim, and Attorney Herbert gave no indication that Sharkey felt the need to change his story to fit what the Government wanted. Even after receiving the warning during the February 13, 2015 interview, Sharkey stated during the February 23, 2015 interview that Defendant had, in fact, left the conspiracy, testimony that would enure to the benefit of Defendant had Sharkey decided to stick with it. Had Sharkey actually been intimidated, it seems more likely that he would have stuck with the story that he gave the Government on April 30, 2014; specifically, he did not recall Defendant telling Ward that he was "done" or "out."

The facts in this case are markedly different than those presented in the cases relied upon by Defendant. For example, in United States v. Vavages, 151 F.3d 1185, 1190 (9th Cir. 1998), substantial interference was found to exist because "three aspect of the prosecutor's conduct" gave

---

[5] As for Sharkey's invocation of his Fifth Amendment rights at the evidentiary hearing, the only thing the record shows is that Sharkey feared possible prosecution by Mississippi authorities for his activities in relation to the charges at issue in this case.

13

the Ninth Circuit "serious pause." The prosecutor (1) articulated his belief that the alibi witness would present false testimony and it did "not require much of an interpretative gloss on the prosecutor's warning to conclude that unless [the witness] changed her testimony or refused to testify at all, she *would* be prosecuted for perjury and suffer any attendant consequences;

(2) "threatened to withdraw [the witness's] plea agreement in her own unrelated criminal prosecution if she testified in support of alibi; and (3) emphasized during his closing arguments that defendant failed "to present anyone but his 'cute[] . . . little kids' to support his alibi defense." Id. (emphasis in original).

Linder involved "one of those rare circumstances" where dismissal of the indictment was warranted in order "to sanction the extreme and damaging conduct" that violated defendant's compulsory process and due process rights. 2013 WL 812382, at *30. There, a United States Marshal, acting as a part of the prosecution team in an excessive force case against a deputy, emailed his subordinates telling them not to discuss the case with the defendant's lawyers absent express authorization and "included a threat to all personnel" that "had the *in terrorem* effect of making a violation of the Marshal's rules a prosecutable offense." Id. at 45. Deputies were also "threatened with discipline if they interacted in any manner socially and personally with [defendant] if Management deemed that the personal interaction improper." Id. The deputies took the warnings to heart, notwithstanding the fact that several wanted to testify as character witnesses, at least one potential witness had "direct exculpatory evidence that undermined the entire prosecution," and "another credible witness with no motivation to fabricate had material and helpful information for the defense . . . did not provide it due to his fear that he would be disciplined." Id. at *46 & 48. Additionally, the emails "were only one piece of an overly aggressive prosecution marked by a

14

federal agent who threatened witnesses with prosecution and prosecutors who joined in by threatening witnesses who would not provide them with the statements they wanted to hear with either being charged with perjury or becoming a focus of the prosecution itself." Id. at 50.

United States v. Morrison, 535 F.2d 223, 228 (3rd Cir. 1976) involved a prosecutor's "bizarre conduct toward a witness for the defense" that was "not to be condoned." There, the witness was defendant's girlfriend who was prepared to testify that she was the one involved in the conspiracy to sell hashish for which defendant was being prosecuted. On the morning of the first day of trial, the witness reassured defense counsel that she was prepared to testify and that fact was communicated to the prosecutor. Thereafter, the witness began to feel "increasingly intimidated under [a] barrage of warnings" from the prosecutor, including three messages to her lawyer, warning that the witness was "liable to be prosecuted on drug charges; that if she testified, that testimony would be used as evidence against her and, further, that as she was now eighteen it would be possible to bring federal perjury charges against her." Id. at 225. The misconduct did not end there. The prosecutor issued an invalid subpoena which summoned the witness to his office and, surrounded by three case agents, the prosecutor "once again impressed upon her the dangers of testifying." Id. at 226.

Tellingly, both Vavages and Linder acknowledge that a prosecutor can warn a witness about the perils of lying, and even inform them about potential prosecution for perjury should they be untruthful on the stand. See, Vavages, 151 F.3d at 1190 (citation omitted) (a defendant "'rights are not trenched upon by mere information or advice about the possibility of a perjury prosecution, but by deliberate and badgering threats designed to quash significant testimony"); Linder, 2013 WL 812382, at *50 ("there is a difference between candidly and aggressively threatening a target with

15

prosecution for offenses for which the target can be charged" which is proper "and the flippant threat that a target will be prosecuted for lying simply because that witness is not answering the investigator's questions in the way that the investigator believes they should be answered"). Here, and on only one occasion, AUSA Hannafan explained to Sharkey that whatever story he told it had better be the truth because there were potential consequences for lying.

Third, even assuming that the Government's interaction with Sharkey was improper – it was not as "[b]oth the prosecution and defense have a right to interview witnesses," Girod, 646 F.3d at 311 – Defendant's Motion fails because he cannot show harm. As the Government aptly observes:

> The record remains devoid of what exactly Sharkey would have testified to but for the alleged intimidation. Would he have testified the defendant told Ward he was withdrawing or not? Would he have testified the defendant withdrew before Sharkey went to Murfreesboro, or afterwards, or "one or two or three weeks" before the agents arrived?

(Docket No. 225 at 11).

At most, the evidence shows that Sharkey said completely different things to different people on a number of occasions and his testimony was never pinned down. His final statement to both sides earlier this year was that he could not say with any certainty what had happened. There is not a scintilla of evidence to suggest that AUSA Hannafan's one-time reality check discussion played any part in Sharkey's ultimate conclusion that he was either 60% certain that Defendant had withdrawn as he told the Government on February 23, 2015, or maybe not even 50% certain as he informed Clemons a few days later. Nor is there any evidence to suggest that AUSA Hannafan's proper warning was the reason that Sharkey chose not to sign the affidavit and informed defense counsel that he would not testify at trial.

### III. Conclusion

On the basis of the foregoing, Defendant's "Motion to Dismiss the Indictment Due to Government Interference With a Defense Witness" will be denied. An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE